2020 IL App (1st) 172162

FIRST DISTRICT
SIXTH DIVISION
October 16, 2020

No. 1-17-2162

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 8940 |
| | ) | |
| KENDRICK SHERMAN, | ) | Honorable |
| | ) | William B. Raines, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Griffin and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial in Cook County circuit court, defendant Kendrick Sherman was convicted of the offense of being an armed habitual criminal (AHC) and sentenced to 12 years' imprisonment. On appeal, he contends that (1) counsel was ineffective for not filing a motion to quash his arrest, (2) the court deprived him of a fair trial by failing to accurately recall the evidence, (3) the court failed to conduct an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into his posttrial claims of ineffective assistance of counsel or into trial counsel's implicit admission of ineffectiveness, and (4) his sentence was erroneous because the court improperly considered in aggravation (a) the prior convictions that were elements of AHC, thus engaging in double enhancement, and (b) a void prior conviction for aggravated unlawful use of a weapon (AUUW). As explained below, we affirm defendant's conviction and sentence but remand for a preliminary *Krankel* inquiry.

¶ 2                                    I. JURISDICTION

¶ 3      On April 13, 2017, the trial court found defendant guilty of AHC. The court sentenced him on August 16, 2017, to 12 years' imprisonment, and he filed his notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                    II. BACKGROUND

¶ 5      Defendant was charged in relevant part with AHC for allegedly, on or about May 14, 2016, knowingly or intentionally possessing a firearm while having prior convictions for residential burglary in case 10 CR 10175 and burglary in case 10 CR 15406.

¶ 6      At trial, the State entered certified copies of said prior convictions.

¶ 7      Police officer Miguel Vazquez testified that he and Officer Victor Razo were patrolling shortly before 10 p.m. on May 14, 2016, when Vazquez saw defendant driving a vehicle with its windshield broken and its headlights unlit despite it being night. Vazquez stopped the vehicle and saw that it contained three passengers in addition to defendant. In particular, Deandre Golden was in the front passenger seat with defendant, while the other two passengers were in the back seat. Defendant produced a driver's license at Vazquez's behest, and Vazquez then checked his name and the passengers' names in LEADS, the Law Enforcement Agency Data System. That check confirmed the validity of defendant's license and showed that he was "on parole and had failed to register as a gun offender," that Golden "also failed to register as a gun offender," and that defendant and Golden were both members of the Black Disciples gang.

¶ 8     Vazquez returned to defendant's vehicle on the passenger side and saw Golden make furtive movements toward the glove box. Vazquez told the occupants of the vehicle to exit, placing Golden and then defendant into custody as they exited. When asked why he detained defendant, Vazquez replied "Because he failed to register as a gun offender, and he was also in violation of his parole conditions." A blue steel Glock pistol with an extended 29- or 30-round magazine, which actually contained 24 bullets, was found in the vehicle. Vazquez described the magazine as 8 to 10 inches long and held his fingers about 10 inches apart. (Defense counsel did not object to this line of questioning or testimony.) The firearm and ammunition were later inventoried. The vehicle was registered to a woman who lived at the same address as defendant. Defendant was taken to the police station, where Razo interviewed him.

¶ 9     On cross-examination, Vazquez testified that police records would show a person who had been gang affiliated as such "for life." He did not see defendant make any furtive movements, only Golden. After Golden was detained, Vazquez found the firearm in the glove box, which "was half closed, partially opened" because the end of the magazine was protruding as if Golden had "jammed" the firearm into the glove box. When the firearm was inventoried, it was attributed to Golden. An arrest report that Vazquez assisted in preparing described defendant as unarmed because he did not have a weapon on his person when arrested.

¶ 10     Razo testified that he interviewed defendant at the police station on the night of his arrest. When Razo asked "why would he risk being in a vehicle with a gun" in light of his parole, defendant had answered, "Man, if I don't have that gun, I'm dead." Razo noted his question and defendant's answer in his police report but did not audio- or video-record the interview or ask defendant to sign a statement memorializing the interview.

- 3 -

¶ 11    Defendant moved for a directed finding, arguing that the firearm was attributable to Golden based on his furtive movements towards the glove box where the firearm was found and that defendant did not "take responsibility for possession of that weapon." The State argued that the driver of a vehicle is presumed to have control over all items therein, that defendant's statement regarding the firearm was an admission of his knowledge of its presence in the vehicle, and that defendant either possessed the firearm solely as the driver or "jointly with others." The State also argued that evidence that Golden put the firearm in the glove box did not exculpate defendant in light of his knowledge and control. The defense argued in rebuttal that, even taking defendant's statement at face value, it did not show that he had knowledge of the firearm before police found it in the glove box but merely acknowledged "that his crew in this car may or may not have had a gun, and if they did, it was because it was dangerous there."

¶ 12    The court asked defense counsel, "You have a gun with a 30-round clip that's 10 inches in length and they can't even get the glove box closed, and you're telling me that people sitting in the car couldn't see that?" Counsel replied that the firearm could have been on Golden's person, such as inside his jacket, until he tried to hide it in the glove box as shown by his furtive movements there. Counsel also argued that defendant was not the registered owner of the vehicle and that the State did not show that he had knowledge of any weapons his passengers may have been carrying.

¶ 13    The court denied the directed finding motion, the defense rested, and the court made no admonishments or inquiries regarding defendant's rights to testify and to remain silent. Following closing arguments, the court found defendant guilty of AHC, expressly finding the officers' testimony credible and noting that the vehicle defendant was driving was registered to his residence. The court found defendant guilty based on his postarrest statement and "testimony of

the officer as to the type of gun it was, the length of the clip, the fact that it couldn't be completely secreted into the glove box." Defendant exclaimed that the court had erred because "[i]t wasn't my gun" and "I never said that."

¶ 14 In his counsel-filed posttrial motions, defendant claimed that the court erred by not admonishing defendant of his right to testify, which deprived him of the opportunity to present certain evidence. In particular, he would have testified that he had no knowledge of the firearm in the vehicle until the police stopped the vehicle because the passenger concealed the firearm on his person until then. Defendant also claimed that the court abused its discretion by allowing the officers to testify to the size of the firearm without requiring the State to offer the firearm itself or a scaled photograph of it into evidence when its size was a material issue.

¶ 15 Defendant claimed that the evidence was insufficient to convict him on a constructive possession basis as he was the vehicle's driver but not its registered owner and because the officers did not testify that he physically possessed the firearm, testified that the passenger made furtive movements toward the glove box, initially inventoried the firearm as the passenger's, and testified to the firearm's size rather than having the State offer the firearm or its photograph into evidence. He distinguished case law holding that possession of a firearm can be proven by testimony alone, arguing that the firearm's size and whether it was concealable were key here. He argued that any statement he made demonstrating knowledge of the firearm would have to be corroborated to be sufficient evidence and that knowledge of a firearm without control over it is not possession.

¶ 16 At the hearing on the posttrial motions, defense counsel argued in relevant part that the control "element of constructive possession also turns on the issue of size and firearm, and its location. This gun was found in the glove box of the passenger side of the vehicle." The court

asked whether "the clip was a 30-round clip and it would not fit into the glove box." Counsel argued that the officers did not testify to the appearance of the firearm or glove box when they approached the vehicle but only when they searched it. The court remarked that police "saw the passenger trying to place the gun in the glove box and the glove box would not close," and counsel clarified that the officer testified only to "furtive movements toward the glove box." Counsel argued that the officer testified to believing that the glove box would not close but not to confirming whether it actually would close with the firearm and magazine inside, nor did the State present evidence of the firearm's size beyond the officer's guess. The court asked counsel why he did not object when the officer so testified without producing the firearm at trial, and counsel claimed that he had objected. Specifically, he told the court that "the objection we believe was made during the direct testimony of the officer as to the gestures and size of the weapon." The State argued that the defense could have argued in closing that the officer's testimony to the size of the magazine was speculative and thus not credible but counsel had not done so. The court remarked that the defense could have requested before trial that the firearm be presented at trial.

¶ 17 Following arguments, the court denied the posttrial motions. The court noted "the size of the car, the fact that the car is registered to an address where the defendant lived, he is the driver of the vehicle. The police pull over the vehicle. *** There is some furtive movement, although the police didn't see your client make a furtive movement. When they walked up, there was a Glock 23, model 23, with a 30-round clip in it. That 30-round clip had 24 live rounds in it plus one in the chamber." The court had found defendant guilty based on this evidence and the credible testimony to defendant's statement. Regarding the control element of constructive possession, the court found that "defendant had the ability to exercise control over the contraband, the glove box is a

mere arm's length away." The court also found that Golden was "trying to close the glove box ***

and could not do that because the clip was so long." The court stated that its finding of guilt rested

not upon the firearm's size but upon defendant's admission and that the defense may have forfeited

the issue of producing the firearm for trial by not requesting it. The parties did not orally argue,

and the trial court did not expressly address, the claim in the posttrial motions that the court had

deprived defendant of his right to testify by not admonishing him.

¶ 18    The presentencing investigative report (PSI) showed that defendant had prior convictions

for (1) residential burglary in case No. 10 CR 10175 and burglary in case No. 10 CR 15406, with

concurrent prison sentences of 10 years and 9 months imposed in February 2011, and (2) AUUW

in case No. 09 CR 7813 and burglary in case No. 09 CR 1972, with initial concurrent "boot camp"

sentences imposed in July 2009 and consecutive prison sentences imposed in June 2010 of 4 years

for burglary and 1 year and 6 months for AUUW. Defendant gave his residence and place of

employment at the time of the instant offense as Indiana, with the Illinois address on his license

being his previous residence until March 2016. He had attended grade and high school in Chicago

and later received his general equivalency diploma (GED) and took college courses while in

prison. He denied having any street gang membership or affiliations, acknowledged that the police

considered him a member of the Black Disciples, and "stated that in 2014 he changed his lifestyle

and with that all of his old friends and acquaintances."

¶ 19    When asked for the PSI to give his account of how he came to be arrested and charged,

defendant had stated:

> "I woke up, I was supposed to work for overtime because it was Saturday but instead we
>
> needed a license plate sticker for the car. We came to Chicago for the sticker and wanted

my son to see his grandparents as well. We got to Chicago, got the sticker at a Currency Exchange in Stoney Island around 67th and Stoney. I dropped off my girlfriend at her friend's house which was one of the 100th Streets and then went to McDonalds for my son. We then stopped by 62nd and Langley at my Grandma's place. She was rehearsing a Jehovah Witness speech and I listened to her practice. Then I left to go visit my mother. I stayed there, had a drink—so I was there over an hour but less than two. On my way out I see a friend of mine's brother and I say—Hi. He asked me which way I was going and I say I was headed towards Stoney Island. He had two friends with him who I didn't know but I said I can give him a ride. He got in the car, we left 78th and Phillips and got to 79th and Jeffrey and then got pulled over. When we get pulled over I see my friend's brother pull out a gun from his waist—at the same time the Police saw it too. He tried to put it under the seat then in the glove compartment and tried to stuff it in there. They put us under arrest, they go back to the car and came back with the gun and say to my friends brother, Deandre Golden—We seen you put that there. They tell us again we are under arrest and then they said I failed to register, but I am registered and have to paperwork to prove it. In the back of the car he (Deandre Golden) kept saying, I'm Sorry. They (Police) said, Be Quiet. Once at the station my girlfriend's father shows up—he's a Chicago Police Officer and he says he is here to get the car. They wouldn't allow it. The picture painted doesn't even make sense. The gun was too big to fit in the glove box—how could I be driving around with my seven year old son and have a gun hanging out the glovebox. Also no lawyer came to talk to me before the trial. I wanted to testify to tell them what happened and explain how I did not see the gun on his person. I seen the gun after he pulled it out, not when he got in the car. I just want to show how he concealed the gun. I would like to

ask the judge to let me demonstrate how the weapon was concealed. Also I want the gun fingerprinted. They (Police) said I said—'I'm dead out here without this gun'. But I don't even stay out here. I left Chicago to get my family away from the violence not to add to it."

The PSI also stated that defendant signed a statement to the aforesaid effect.

¶ 20    At sentencing, the parties made no corrections to the PSI, and the court acknowledged reading it. The State noted defendant's criminal history, including being resentenced from "boot camp" to imprisonment and committing the instant offense while on parole. The State also argued that the firearm's 30-shot capacity and that it actually held 25 bullets showed that defendant was not armed merely to defend himself. The defense argued that defendant at the time of this offense was employed, supporting a child, residing in Indiana, and visiting Illinois on personal business after his work shift. Counsel also argued that defendant had his GED and had taken college courses.

¶ 21    Defendant addressed the court, apologizing to his family and expressing his desire to return to his son. He "made a bad decision" by returning to Illinois and giving someone a ride, but he "did what I did in the past" and was working. He did not mention any of the claims in the PSI.

¶ 22    The court then sentenced defendant to 12 years' imprisonment, with fines and fees, stating "your background is not conducive to a six-year sentence. You've had a gun in your background. You have got two burglaries that you were sentenced to 10 years and 9 months." As to the instant offense, the court stated that "I believe that you possessed that gun. I believe that you handed it off to your friend to put in the glove box." Defendant had "a Glock pistol that's got a 30-round clip in it with 24 rounds in the clip and one in the chamber. The only thing that could happen is bad. 25

people could die because of those bullets in that gun, and I don't think six years is enough to be perfectly honest with you." No postsentencing motion was filed, and this appeal timely followed.

¶ 23                                    III. ANALYSIS

¶ 24    On appeal, defendant contends that (1) trial counsel was ineffective for not filing a motion to quash his arrest, (2) the trial court deprived him of a fair trial by failing to accurately recall the trial evidence, (3) the court failed to conduct a *Krankel* inquiry into his posttrial claims of ineffectiveness or into counsel's implicit admission of ineffectiveness, and (4) his sentence was erroneous because the court improperly considered in aggravation (a) the prior convictions that were elements of AHC and (b) a void prior conviction for AUUW.

¶ 25                                  A. Motion to Quash

¶ 26    Defendant first contends that trial counsel was ineffective for not filing a motion to quash his arrest because he was arrested without probable cause, such that the gun and his statement would have been suppressed. Specifically, he contends that arresting him based on information from LEADS was improper because information in a police flyer or bulletin is insufficient to provide probable cause for arrest and because both stated bases for arresting him—violating parole and not registering as a gun offender—were based on unverified information. He also contends that Golden's furtive movements did not provide probable cause to arrest Golden, much less defendant.

¶ 27    On an ineffective assistance claim, a defendant must show that counsel's performance both (1) fell below an objective standard of reasonableness and (2) prejudiced the defendant, that is, that there is a reasonable probability that the result of the proceeding would have been different had counsel's performance not been deficient. *People v. Jackson*, 2020 IL 124112, ¶ 90. The

decision whether to file a motion to quash arrest and suppress evidence is generally a matter of trial strategy entitled to great deference, and a defendant shows ineffective assistance based on the failure to file such a motion if both (1) the unargued motion was meritorious and (2) a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *People v. Gayden*, 2020 IL 123505, ¶ 28.

¶ 28  Probable cause exists when the facts known to the arresting officer at the time, based on the totality of the circumstances, are sufficient to lead a reasonably cautious person to believe that the defendant has committed a crime. *People v. Gocmen*, 2018 IL 122388, ¶ 19. A "reasonably cautious person" is not an average citizen nor the legal touchstone of a "reasonable person." *Id.* ¶ 33. "The standard is the probability of criminal activity, not proof beyond a reasonable doubt or even that it be more likely than not." *Id.* ¶ 19. Probable cause is based not on legal intricacies applied by legal experts but on the factual and practical considerations of everyday life upon which reasonable and prudent persons act. *Id.* ¶ 43. Hearsay, including hearsay inadmissible at trial, is therefore a permissible basis for a finding of probable cause. *Id.*

¶ 29  LEADS " 'is a statewide, computerized telecommunications system designed to provide services, information, and capabilities to the law enforcement *and criminal justice* community in the State of Illinois.' " (Emphasis added and omitted.) *Jankovich v. Illinois State Police*, 2017 IL App (1st) 160706, ¶ 44 (quoting 20 Ill. Adm. Code 1240.10(a) (1999)). All Illinois law enforcement agencies must submit information concerning arrests, charges, and dispositions of charges, and "a host of other information" must be submitted to LEADS including missing persons information, warrants, civil no contact orders, and orders of protection. *Id.* In short, "LEADS is a compilation of criminal justice information." *Id.* ¶ 45.

¶ 30    Here, defendant argues that information from LEADS is unreliable and cannot be the basis for probable cause without officers independently verifying or confirming the data. The cases he cites in support of this proposition concern arresting a person based solely upon an investigative alert. It does not follow that it is improper to arrest a person for some present action of the defendant actually witnessed by officers that they reasonably believe to be rendered an offense by some status or condition that they learn from police, criminal, or other records. For instance, driving is not an offense, but driving with a suspended or revoked license is. See *People v. Maas*, 2019 IL App (2d) 160766, ¶¶ 73-76. Officers in the field learn that a driver has an invalid license and decide that they have probable cause to arrest a driver for driving on a suspended or revoked license, by consulting databases such as LEADS. We find that the cases regarding investigative alerts do not cast doubt on such probable cause decision making.

¶ 31    After stopping the vehicle defendant was driving for a broken windshield and unlit headlights at night, the officers learned that both defendant and Golden, who were together in the front seat of the vehicle, were not merely gang-affiliated but both were linked to the same gang. They also learned that defendant was on parole at the time, a fact that defendant does not challenge. Just as driving is not an offense but driving on a suspended or revoked license is, two gang members riding together in a vehicle is not an offense, but consorting with fellow gang members while on parole is a violation of parole. A reasonably cautious person could conclude that defendant and Golden were both affiliated with the same gang, infer his knowledge from the circumstances including them being together closely, and conclude that defendant was violating his parole by being with Golden.

¶ 32     Defendant notes the testimony here that police records reflect a gang-affiliated person as such indefinitely. However, it does not follow from the fact that some such notations *may be* outdated that any particular notation *is* outdated. In other words, while such a notation in police records is not certain proof—or even necessarily admissible evidence—of a person's present gang affiliation, probable cause for arrest does not require certainty or proof beyond a reasonable doubt and can be based on hearsay that practical people act upon even if it would be inadmissible at trial. We conclude that a motion to quash defendant's arrest for lack of probable cause was not meritorious and unlikely to succeed so that counsel was not ineffective for not filing one.

¶ 33                               B. Misrecalled Evidence

¶ 34     Defendant contends that the court deprived him of a fair trial by failing to accurately recall the evidence, specifically that the court mistakenly stated that (1) defendant was within arm's reach of the glove box, (2) the firearm was so large it could not be hidden and thus all occupants of the vehicle would have seen it, (3) it believed defendant had handed the gun to Golden, without any evidence to that effect, and (4) the size of the car supported its guilty finding when there was no trial evidence of what kind of vehicle defendant and Golden were in on the night in question.

¶ 35     In a trial, the trier of fact resolves discrepancies and inconsistencies in the testimony, weighs the evidence, and may draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 2020 IL 124112, ¶¶ 64, 66. A trier of fact may infer from facts and circumstances in evidence other connected facts that reasonably and usually follow according to common experience. *People v. York*, 2020 IL App (2d) 160463, ¶ 17; see also *People v. Bishop*, 218 Ill. 2d 232, 250 (2006) (trier of fact can infer element of bodily harm or injury from circumstantial evidence based on common experience). A trier of fact is not required to disregard inferences that

flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt, nor to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt. *Jackson*, 2020 IL 124112, ¶ 70.

¶ 36    Here, we find it a reasonable inference from the evidence, through the lens of common experience, that defendant was within arm's reach of the glove box though no specific evidence was elicited on the point. The purpose of a glove box or compartment in a vehicle is for the driver to keep driving gloves (hence its name), registration and insurance documents, and other necessities and accoutrements of driving within his or her reach. For similar reasons, we find the trial court's remark about the size of the vehicle, when there was no trial testimony as to the type of vehicle at issue, to be harmless; that is, it did not deprive defendant of a fair trial.

¶ 37    The court's conclusion that the firearm with its magazine was too large to be hidden in the glove box was based firmly on Officer Vazquez's testimony that the magazine was about 10 inches long and held 29 or 30 shots and that the glove box "was half closed, partially opened" because the end of the magazine was protruding as if Golden had "jammed" the firearm into the glove box. The absence of the actual firearm at trial, unrequested by the defense before trial and unargued by the defense until the posttrial motions, does not somehow negate or contradict that testimony.

¶ 38    Lastly, the court's sentencing remark that it believed defendant passed the firearm to Golden to hide in the glove box follows as a reasonable inference from finding Officer Razo's testimony to defendant's statement to be credible. The remark "Man, if I don't have that gun, I'm dead" is reasonably interpreted as an admission that the firearm was defendant's. In light of that statement and the evidence showing that Golden made furtive movements toward the glove box as

the officers returned to the vehicle and that the firearm was found protruding from the glove box, it is not a leap of logic for the court to believe that defendant gave the firearm to Golden to quickly hide in the glove box as the officers returned to the vehicle.

¶ 39                                                      C. *Krankel*

¶ 40     Defendant contends that the court erred by not conducting a *Krankel* inquiry into his posttrial claims of ineffectiveness or into trial counsel's implicit admission of ineffectiveness. Specifically, defendant's statement in the PSI and counsel's posttrial motions both raised the issue of defendant not being afforded the opportunity to testify to his exculpatory account of events.

¶ 41     When a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel before the trial court, whether in writing or orally, the court must conduct a *Krankel* inquiry to determine whether to appoint new counsel to argue the defendant's ineffectiveness claims. *Id.* ¶¶ 95-96. A defendant is not required to do anything more than bring his or her claim to the court's attention; he or she need not allege the factual basis for the claim and may raise the claim informally as in a letter or note addressed to the court. *People v. Bates*, 2019 IL 124143, ¶ 15. Conversely, the trial court is not required to conduct a *Krankel* inquiry into defense counsel's representations or remarks unless they constitute a clear claim of ineffective assistance raised at the defendant's behest. *Id.* ¶¶ 21, 33. Thus, a *Krankel* inquiry is not triggered by defense counsel's remarks or claims implying his prior ineffective assistance. *Id.* ¶¶ 31-34.

¶ 42     While the trial court need not appoint new counsel automatically when a defendant makes *pro se* ineffectiveness claims, it must conduct an inquiry into the underlying factual basis of the claims that is sufficient to determine any factual basis of the claims. *Jackson*, 2020 IL 124112, ¶ 97. It may examine the defendant, examine trial counsel, or make its determination based on its

knowledge of counsel's performance and the insufficiency of the allegations. *Id.* ¶ 110. The question on review, which we consider *de novo*, is whether the trial court conducted an adequate inquiry into the defendant's ineffectiveness allegations. *Id.* ¶ 98.

¶ 43    In *People v. Harris*, 352 Ill. App. 3d 63, 71 (2004), this court found that *Krankel* was not triggered by a defendant's remark in a PSI that he was going to appeal because trial counsel had not called certain specified witnesses for the defense. However, as stated above, our supreme court has emphasized since then both that a *pro se* ineffectiveness claim need not be specific and need not be raised formally so long as it is brought to the trial court's attention. We have remarked since *Harris* that a defendant:

"made an out-of-court statement complaining of trial counsel's representation, chronicled in a written document whose content was then communicated to the trial court at a posttrial proceeding. Instead of an [attorney discipline] complaint, we have here a PSI, which is far more germane to a defendant's posttrial proceedings than an unrelated complaint to the state's bar disciplinary body—and which the trial court is required and presumed to have read." *People v. Downing*, 2019 IL App (1st) 170329, ¶ 20.

We noted that our supreme court has interpreted *Krankel* liberally to "encourage the resolution of claims where and when they are most likely to be resolved correctly and efficiently." *Id.* ¶ 38.

"[T]he whole point of *Krankel* is that we should *not* kick the can down the road. Rather, we should maximize the number of claims that are heard when and where they are most likely to be resolved correctly and efficiently. And that means in the trial court, as soon as the defendant's posttrial allegations of attorney incompetence have been made known to the judge." (Emphasis in original.) *Id.* ¶ 41.

¶ 44    Here, the PSI reflected defendant's statement that, in relevant part, "no lawyer came to talk to me before the trial. I wanted to testify to tell them what happened and explain how I did not see the gun on his person. I seen the gun after he pulled it out, not when he got in the car. I just want to show how he concealed the gun. I would like to ask the judge to let me demonstrate how the weapon was concealed." While defendant did not *expressly* accuse trial counsel of ineffective assistance, he clearly alleged that (1) counsel did not consult with him before trial and (2) he wanted to testify and give his account of events to the court. These allegations are reasonably read as a claim that counsel deprived him of his right to testify by not properly consulting with him.

¶ 45    While defendant did not raise these allegations in open court, he raised them in the PSI, which as we stated above a trial court is expected to consider and which the trial court here acknowledged reading. *Harris* to the contrary notwithstanding, we find that defendant's ineffectiveness claim in a PSI, intended to be read by the trial court, triggered a *Krankel* inquiry.

¶ 46    However, defendant's allegations did not prompt the court to make the slightest inquiry into them by examining either him or trial counsel. The court also did not expressly address the related counsel-filed claim that it had deprived defendant of the opportunity to testify at trial to his allegedly exculpatory account by not admonishing him of his right to testify. Thus, we cannot conclude on this record that the court conducted a *Krankel* inquiry by examining defendant, examining trial counsel, or making a determination based on its knowledge of the insufficiency of the allegations. We must therefore remand for the trial court to conduct a *Krankel* inquiry.

¶ 47                                    D. Sentencing

¶ 48     Lastly, defendant contends that his sentence was erroneous because the court improperly considered in aggravation (1) the prior convictions that were elements of AHC, thus engaging in double enhancement, and (2) a void prior conviction for AUUW.

¶ 49     As a threshold matter, we note that defendant filed no postsentencing motion in the trial court. The plain-error doctrine allows a reviewing court to consider unpreserved errors, including sentencing errors, when a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) the error was so serious that it affected the fairness of the trial and the integrity of the judicial process. *People v. Jones*, 2016 IL 119391, ¶ 10. The defendant bears the burden of showing plain error, and the first step of plain-error analysis is determining whether an error occurred at all. *Id.*

¶ 50     AHC is a Class X felony punishable by 6 to 30 years' imprisonment. 720 ILCS 5/24-1.7(b) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016).

¶ 51     It is improper double enhancement when either (1) a single factor is used both as an element of an offense and as a basis for imposing a longer sentence than may otherwise have been imposed, or (2) the same factor is used twice to elevate the severity of the offense itself. *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). "The prohibition against double enhancements is a rule of statutory construction, premised on the assumption that the legislature considered the factors inherent in the offense in fashioning the appropriate *range* of punishment for that offense." (Emphasis added.) *Id.* "The prohibition against double enhancements is based on the assumption that, in designating the appropriate *range* of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." (Emphasis added.) *People v. Phelps*, 211 Ill. 2d 1, 12 (2004).

¶ 52    The rule that a court may not consider a factor inherent in the offense in sentencing should not be applied rigidly because public policy demands that a sentence be varied according to the circumstances of the offense. *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 15; *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 13. For instance, the degree of harm inflicted on the victim may be considered as an aggravating factor in imposing a sentence even when serious bodily harm is implicit in the offense. *Sauseda*, 2016 IL App (1st) 140134, ¶ 17. A court is not required to refrain from any mention of sentencing factors that constitute elements of the offense. *Id.* ¶ 15. The defendant bears the burden of establishing that a sentence was based on an improper consideration, and we will not vacate a sentence based upon an improper factor if we can determine from the record that the weight placed on the improperly considered factor was so insignificant that it did not lead to a greater sentence. *People v. Grant*, 2019 IL App (3d) 170185, ¶28.

¶ 53    Our supreme court found no improper double enhancement when a trial court used a victim's (1) severe and permanent disability to raise a defendant's battery offense from a misdemeanor to a Class X felony, punishable by 6 to 45 years' imprisonment, sentencing the defendant within that range to 30 years' imprisonment, and (2) great bodily harm to raise a defendant's kidnapping offense from a Class 2 to a Class X felony, punishable by 6 to 30 years' imprisonment, sentencing the defendant within that range to 15 years' imprisonment. *Phelps*, 211 Ill. 2d at 13-14. "Thus, the severity of each offense was enhanced only once." *Id.* at 14.

¶ 54    Here, the trial court referred to defendant's prior convictions, including the burglaries underlying his AHC offense, in finding that he should not receive the minimum six-year sentence. We do not believe that the court acted improperly in so stating in light of the statutory requirement that the court weigh defendant's criminal history as it relates to his rehabilitative potential. See

730 ILCS 5/5-5-3.2(a)(3) (West 2016). In other words, defendant's prior felony convictions with increasing sentences and resentencing from a "boot camp" sentence were proper considerations in determining his sentence within the Class X range, and the fact that some of those prior convictions were elements of his AHC offense did not require the court to disregard those convictions and their sentences. Moreover, even if we were to find the court's reference to defendant's burglary convictions to be improper, it also referenced an independent factor—the evidence that the firearm could hold 30 shots and actually held 25 bullets—as another reason for imposing a sentence above the minimum. We find that defendant has not shown a reversible double enhancement.

¶ 55    As to the court considering defendant's prior conviction for AUUW, this record does not support defendant's assertion that said conviction is void. There are both void and valid bases for an AUUW conviction, the latter including that the defendant did not have a valid Firearm Owner's Identification Card, and the valid provisions of the AUUW statute are severable from the void ones. See, *e.g.*, *People v. Mosley*, 2015 IL 115872. This record does not establish which version of AUUW defendant was previously convicted of. For instance, supplemental records have been filed herein but do not contain any documents related to the AUUW conviction, and the PSI in the record does not include any printouts of police or criminal histories. Upon this contention, we cannot find a clear or obvious error and thus find no plain error.

¶ 56                                      IV. CONCLUSION

¶ 57    Accordingly, the judgment of the circuit court is affirmed, except that we remand for the trial court to conduct a preliminary *Krankel* inquiry into defendant's ineffective assistance claim.

¶ 58    Affirmed and remanded with directions.

---

**No. 1-17-2162**

---

| | |
|---|---|
| **Cite as:** | *People v. Sherman*, 2020 IL App (1st) 172162 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-8940; the Hon. William B. Raines, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and S. Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Akash B. Vyas, Assistant State's Attorneys, of counsel), for the People. |

---