2022 IL App (1st) 211085-U

No. 1-21-1085

Order filed August 22, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 02417 |
| | ) | |
| STANLEY JONES, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reverse defendant's conviction for armed habitual criminal where there was insufficient corroborating evidence to show that he constructively possessed the recovered firearm to establish the crime's *corpus delicti*. Under *People v. Krankel*, 102 Ill. 2d 181 (1984), the cause is remanded for a preliminary inquiry into defendant's posttrial claim of ineffective assistance of trial counsel contained in the presentence investigation report.

¶ 2    After a bench trial, Stanley Jones was found guilty of one count of armed habitual criminal (AHC) and one count of possession of a controlled substance (PCS). The trial court imposed

concurrent terms of 11 and 2 years in prison, respectively. On appeal, Jones challenges his conviction for AHC, contending that the State failed to prove beyond a reasonable doubt that he constructively possessed the firearm, so there was insufficient corroborating evidence to prove *corpus delicti*. He further seeks remand for a limited hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984). He does not contest his conviction and sentence for PCS.

¶ 3     We vacate Jones's conviction and sentence for AHC because the State failed to present sufficient evidence to establish *corpus delicti* of AHC. We also remand for a preliminary *Krankel* inquiry, as required by the recent Supreme Court decision in *In re Johnathan T.*, 2022 IL 127222, which covers the circumstances here as a sufficient trigger of the duty to conduct a preliminary *Krankel* inquiry.

¶ 4                                    Background

¶ 5     On January 16, 2020, the Chicago police obtained a warrant to search Jones and an apartment to seize heroin, related paraphernalia, money, records detailing illegal drug transactions, and documents or evidence showing proof of residency. Later that day, Jones was arrested a block from the apartment, and the apartment searched. An indictment charged Jones with one count each of AHC, PCS with intent to deliver, and unlawful use of a weapon by a felon (UUWF).

¶ 6     Jones filed a motion to quash arrest and suppress evidence, arguing that he was arrested without an arrest warrant or probable cause. And even if probable cause to arrest existed, the police violated his fourth amendment rights when they did not transport him "without unnecessary delay" to a nearby police station but rather first transported him to the target residence of the search warrant. The trial court held a simultaneous motion hearing and bench trial. Before proceeding with the hearing, the State nol-prossed the count charging UUWF.

¶ 7    Chicago police officer Angel Collazo testified that he was part of a surveillance team assigned to execute the search warrant on Jones and an apartment address. Collazo was given a description of a car belonging to Jones, including its license plate number. He also received a photograph of Jones. After Collazo testified, he was given a photograph of "defendant." The trial court stated, "That will only be—the identification will only be allowed in for the motion."

¶ 8    Collazo and his partner, Officer Guillermo Tellez, conducted surveillance in plain clothes from a covert car about 30 feet from the apartment. Around 3:50 p.m., Collazo saw a car approaching that matched the description. When it passed, Collazo recognized the driver as Jones, whom he identified in court. Collazo performed a U-turn and followed Jones until he parked. Collazo, who had his window down, stopped about 20 to 25 feet from Jones's car. He heard Jones, s in his car with the driver's window down engage in conversation with a woman standing on the corner. Specifically, he heard Jones say something to the effect of, "[W]hat's up, baby girl, need some rocks[?]" Collazo testified that "rocks" is a street term used for crack cocaine. He alerted enforcement officers, who arrived and arrested Jones.

¶ 9    Collazo and Tellez drove to a location a few blocks away to meet up with the team to prepare to execute the search warrant of the apartment. Officer Jason Bala "stated that the defendant related to him that there was a firearm in the residence and that it was in a bedroom that was across [from] the bathroom." Bala added that Jones told him the firearm would be in the bedroom's closet in a yellow postal envelope. During redirect examination of Collazo, the trial court commented, "[T]here's a lot of hearsay, especially Officer Bala talking to Jones, which would be admitted in for the motion but not for the case-in-chief at this time."

¶ 10    Based on this information, the officers relocated to the apartment where a sergeant knocked on the door and announced their office. Jones's grandmother answered.

¶ 11    Collazo testified that "several individuals" were inside the apartment. An evidence officer took photographs of the residence. Next, Collazo went to the bedroom across from the washroom, opened the closet door, and found an unsealed but folded yellow envelope with what felt like a hard object. He unfolded the envelope, looked inside, and saw a loaded firearm in a holster and a separate 9-millimeter magazine. "[M]ale clothing and shoes" were in the bedroom. The evidence officer photographed and recovered the firearm, a semiautomatic 9-millimeter Taurus.

¶ 12    On cross-examination, Collazo agreed that after Jones was placed in custody, driven in an unmarked car to the apartment and moved to a marked car. Collazo characterized the distance between the arrest and search locations as "about a block away."

¶ 13    When shown photographs of the apartment, Collazo agreed they depicted prescription bottles in the kitchen. He did not know whether the bottles had Jones's name on them. He agreed there were photographs of a "female purse" and a "gigantic pile of mail" on the dining room table, and that none of the mail had Jones's name. A photograph of the washroom showed a prescription bottle, but Collazo did not know whether it had Jones's name on it. Collazo agreed it was "fair to say" that "they would have been noted in the report had they noticed his name." Collazo identified photographs of two bedrooms with beds in them and agreed that nothing in either of those rooms indicated Jones stayed in them.

¶ 14    Collazo also identified a photograph of the "bedroom" in which he found the firearm. He agreed there was no bed, the photograph did not depict the closet, and papers depicted in the

- 4 -

photograph were not linked to Jones in any way. Although he saw male clothing in some of the bags in that bedroom, he did not think photographs were taken of the clothing.

¶ 15    Chicago police officer Noel Esquivel testified that he was an enforcement officer and evidence recovery officer for the case. Before executing the search warrant, he attended a briefing with the rest of his team, during which he learned of Jones, the target of the search warrant, and viewed a photograph of him. He was also given the target address and a description of a car Jones might be driving.

¶ 16    About 3:53 p.m., Esquivel was in an unmarked squad car with his partner, Officer Bala, when he received information from surveillance officers that Jones was driving in the area. According to the surveillance officers, Jones had parked at a nearby intersection where he yelled out to a woman on the sidewalk, "[W]hat's up baby, do you need any rocks, do you need some rocks?" In response, Esquivel and Bala drove to where Jones had parked. In court, Esquivel identified Jones as the person in the driver's seat.

¶ 17    The police ordered Jones to get out and placed him in custody for soliciting unlawful business. Police searched Jones's person and car. The police recovered $1,232 on him and a digital scale from the car. Esquivel placed Jones in the back of his unmarked squad car, and Sergeant Ed Escalante read him his *Miranda* rights in Esquivel's presence. At that point, "Jones stated that the grandma and the sister was [*sic*] at home; that he didn't want them to get alerted. You know, I have a pole in my bedroom, which is directly across from the washroom and it's in the closet." According to Esquivel, "pole" means a handgun in street terminology for a handgun. Esquivel did not recall Jones indicating what type of packaging the handgun. The parties stipulated "that Officer

Esquivel learned that the defendant possessed a firearm in his bedroom room [*sic*] after the defendant was arrested for soliciting unlawful business and after he was given *Miranda* warnings."

¶ 18    Jones said that he had "keys to the building or the apartment," which Esquivel recovered from him. Before going to the apartment, the team gathered for a quick briefing on Jones's statement made in the presence of Esquivel, Escalante, and Bala. They transported Jones to the apartment in a marked car.

¶ 19    After the team entered the building, Escalante knocked on the target apartment's door. The grandmother answered. Escalante informed her of the search warrant for the apartment. Esquivel took photographs, and a systematic search was conducted. Esquivel recovered a loaded 9-millimeter semiautomatic handgun, a holster, and an extra magazine from a closet in a bedroom across from the washroom. He inventoried the items, which had been inside a yellow envelope. The keys recovered from Jones locked and unlocked the rear entrances to the building and the apartment.

¶ 20    After the search, police took Jones to the station. During processing, Esquivel saw that Jones wore more than one layer of pants. When Esquivel took Jones's outer pants off, a bag containing 17 Ziploc baggies of suspect crack cocaine fell to the ground. The baggies were sent to the Illinois State Police for testing.

¶ 21    On cross-examination, Esquivel identified the search warrant and complaint for a search warrant, and both were admitted into evidence "for the motion but not for the trial." Esquivel clarified that he was standing outside the unmarked squad car when Jones spoke about the "pole." After being shown photographs of the firearm, Esquivel agreed that there were no photographs "of the closet with this package before it was opened."

¶ 22    The parties stipulated that, if called as a witness, an expert in forensic drug chemistry would have testified that 14 of the 17 baggies tested positive for 1.1 grams of cocaine. In addition, the State entered into evidence certified copies of convictions for UUWF from 2007 and 2009.

¶ 23    Jones moved for a directed finding, which the trial court denied.

¶ 24    Valerie Jones, Jones's mother, testified that she was familiar with the apartment. Her mother, Anna Smith, lived in the apartment. When asked if anyone else lived there, she said, "Alexis Johnson, Taquita Jones, Stanley Jones, Sr., Calvin Nichols. And I don't know Alexis, my sister's boyfriend's name. And Larry Williams stay[s] there sometimes." When shown a photograph of the bedroom where the firearm was recovered, she identified it as "my mother's middle junk room, storage room," and not anyone's bedroom.

¶ 25    On cross-examination, she agreed the multiple people who lived in the apartment might have had items in the junk room. When asked whether Jones might have had items in that room, she said, "Not to my knowledge. My son wasn't there." She acknowledged, however, that "[a]nything is possible." When asked whether she did not want to see anything bad happen to her son, Jones responded:

    "Well, you know what, ma'am? I'm not the kind of mother that—you know, I don't hold up for my children. I have three children. You know, quite naturally, any mother don't want anything to happen to their child. But I feel like this. You know, whatever goes, you know, you have to deal with it. I'm not going to sit here and lie for him. I'm not going to uphold him. Because guess what. At the end of the day, if I lie, you all find out I lied; I got to go to jail. I got a 14-year-old, and I got a business to run. No, I don't lie for my son. No,

I don't want anything to happen to him because I pray for him daily. But I'm not going to lie for him, no."

¶ 26    Following arguments, the trial court denied the motion to quash arrest and suppress evidence. The court also found Jones guilty of AHC and the lesser-included offense of PCS.

¶ 27    Jones filed a motion for reconsideration or, in the alternative, a new trial, which the trial court denied. After the court announced its decision, Jones interjected, "Excuse me, Judge, your Honor." The court told Jones to consult with his attorneys before speaking as any statements he made could be used against him. When Jones interjected again, stating he had a right to speak, the court cut him off.

¶ 28    At sentencing, the State highlighted Jones's past convictions in aggravation. In mitigation, defense counsel presented a character letter from an Illinois state representative and argued that Jones was a model prisoner who worked sanitation and maintenance in prison. Counsel also noted Jones's work history, church activity, involvement as a parent, and health issues.

¶ 29    Jones made a lengthy statement in allocution. Among other things, he thanked the court for the opportunity to see his family, acknowledged that he had done "stupid" things, and asserted he was in his 30s and had learned from his mistakes. Jones denied making the statement the police attributed to him. He stated he wished he could confront the "John Doe" who served as an informant for the search warrant and noted that no heroin was recovered, despite John Doe's allegation that Jones sold him heroin. Jones asserted that he and his mother had health issues, highlighted his love for his family, and questioned the sentencing scheme for AHC compared to other crimes, especially those involving the discharge of a firearm.

¶ 30    The presentence investigation (PSI) report included the following paragraph under the heading "Defendant's Version of the Offense":

"[Defendant] was asked to discuss what happened on the day he was arrested, and he stated, 'I did not live at the residence. I was not at the residence. I did not have knowledge of a gun. I never gave a statement to the police regarding a gun. I never had keys in my possession of this residence. I asked my lawyer to challenge the search warrant, and he did not challenge the search warrant. I have mail from the Chicago Police Department headquarters with a different address and not the address of the search warrant. I have a state I.D. also proving my actual address. It does not have anything to do with [the] address on the search warrant. My fiancé was going to take the stand to tell the court my actual address. We lived together since August or September 2019, and this address is not the one on the search warrant. My fiancé was not put on the stand."

¶ 31    The court imposed concurrent prison terms of 11 years for AHC and 2 years for PCS. In announcing the sentence, the court said it considered the PSI report, the statutory factors in aggravation and mitigation, non-statutory factors in mitigation, and Jones's statement in allocution. The court acknowledged family support, yet, could not "close [its] eyes to you not accepting responsibility for these actions." The court denied Jones's motion to reconsider sentence.

¶ 32                                      Analysis

¶ 33    On appeal, Jones first challenges the sufficiency of the evidence to sustain his conviction for AHC. He argues that the State's evidence did not prove the *corpus delicti* of AHC, and his conviction cannot be sustained under a theory of constructive possession of the firearm.

¶ 34    When reviewing the sufficiency of the evidence, the relevant inquiry asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt about the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 35    Under Illinois law, the State must prove two distinct propositions beyond a reasonable doubt: (1) a crime occurred, that is, the *corpus delicti*, and (2) the person charged committed the crime. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). While a defendant's confession may be integral to proving the *corpus delicti*, proof of the *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement. *Id.* Instead, "Where a defendant's confession is part of the proof of the *corpus delicti*, the prosecution must also adduce corroborating evidence independent of the defendant's own statement." *Id.* The independent corroborating evidence must tend to show the commission of a crime but need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt. *People v. Lara*, 2012 IL 112370, ¶ 18. A conviction based on a confession must be sufficiently corroborated. *Sargent*, 239 Ill. 2d at 183. Stated differently, "the evidence to convict a defendant cannot be sufficient unless there is proof of *corpus delicti* beyond a reasonable doubt." *People v. Walker*, 2020 IL App (1st) 162305, ¶ 24.

¶ 36                                     AHC Claim

¶ 37    To sustain the conviction of AHC, the State was required to prove beyond a reasonable doubt that Jones possessed a firearm and had been twice convicted of certain offenses. 720 ILCS

5/24-1.7(a) (West 2020). Jones does not dispute the existence of qualifying convictions. So, the relevant inquiry is whether the State proved he possessed a firearm. Since he was not found in actual possession of the firearm, the State had to present corroborating evidence that he constructively possessed it. *Walker*, 2020 IL App (1st) 162305, ¶ 20. To establish constructive possession, the State must prove that Jones had knowledge of the firearm's presence and exercised immediate and exclusive control over the area where it was found. *Id.*

¶ 38    We find the State failed to show sufficient corroborating evidence, independent of Jones's statement, tending to prove constructive possession.

¶ 39    For constructive possession, control requires showing that the defendant had the intent and capability to maintain control and dominion over contraband, even without personal present dominion over it. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Proof of control of premises where contraband is found, in turn, creates an inference of knowledge and possession. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. When a residence, evidence of habitation demonstrates control to establish constructive possession. *Id.*; *cf. People v. Lawton*, 253 Ill. App. 3d 144, 147-48 (1993) (where premises not being used primarily as residence, proof of residency has little relevance to issue of control).

¶ 40    Here, the apartment was a residence, not a "stash house." Several individuals, including Jones's grandmother, were present when the police executed the search warrant. Jones's mother testified that six or seven people lived in the apartment. Additionally, the photographs of the apartment entered into evidence show food, dishes, and prescription bottles on the kitchen table; pots and pans on the stove; drinks, a purse, and mail on the dining room table; a shower chair in the washroom tub; televisions in two rooms; beds in two of the three bedrooms; and personal items

in all the rooms. As a residence, proof of Jones's residency, in the form of items like rent receipts, utility bills, and clothing in closets, would show control. *Lawton*, 253 Ill. App. 3d at 147.

¶ 41    The only evidence of Jones's residency and control, beyond his statement to Esquivel referencing "my bedroom," was his possessing keys to the apartment building and the apartment. Still, mere possession of keys is insufficient proof of constructive possession. *People v. Fernandez*, 2016 IL App (1st) 141667, ¶ 21; *People v. Orta*, 361 Ill. App. 3d 342, 349 (2005). The State presented no mail, identification cards, or other proof of residency. In addition, although Collazo testified that he saw male clothing in the bedroom, Jones's mother testified that three men other than Jones lived there and one additional man stayed sometimes. For these reasons, we do not find that the presence of male clothing indicative of Jones's residency and control.

¶ 42    We conclude that, viewed in the light most favorable to the prosecution, insufficient corroborating evidence exists to show Jones constructively possessed the firearm. See *Walker*, 2020 IL App (1st) 162305, ¶ 25.

¶ 43    In reaching this conclusion, we considered the State's argument that "the recovery of the gun from the precise location that Jones had just described" corroborates Jones's statement for purposes of *corpus delicti*. In support, the State cites *Spencer*, 2012 IL App (1st) 102094, and *People v. Hannah,* 2013 IL App (1st) 111660. These cases do not persuade us.

¶ 44    In *Spencer*, the defendant was convicted of unlawful use of a weapon (UUW) after officers executed a search warrant naming both the defendant and a single-family home. *Spencer*, 2012 IL App (1st) 102094, ¶¶ 1-2. In one of the three bedrooms, officers recovered three live rounds of ammunition on a dresser along with about $9000 in cash. *Id.* ¶ 4. In the "closet area," the police recovered men's clothes and "several other items indicating that the defendant lived in the house,"

including "(1) a [three-month-old] letter from the circuit court of Cook County probation department, which was addressed to defendant at that house, (2) the defendant's Illinois identification card bearing the same address, (3) two photographs of the defendant and other men, and (4) a set of keys that opened the outer door of the house." *Id.* After recovering the items, an officer placed the defendant into custody and read him his *Miranda* rights. *Id.* The defendant stated, "[I]f you had my kind of money, you'd have a gun, too." *Id.* As the police searched the kitchen, an officer knelt on top of the kitchen counter, reached above the kitchen cabinet, and retrieved a loaded handgun and a bag of ammunition. *Id.* ¶ 5.

¶ 45    On appeal, the defendant challenged the sufficiency of the evidence. *Id.* ¶ 15. After reviewing the evidence showing that the defendant lived in the home, we held that a rational trier of fact could have found the defendant constructively possessed the handgun and ammunition. *Id.* ¶ 18. We rejected the defendant's argument that consideration of his statement regarding the need for a gun violated the *corpus delicti* rule. *Id.* ¶ 22. We stated that the recovery of the handgun from above the kitchen cabinet constituted sufficient evidence to corroborate his statement and concluded that "[b]ased on all of the above considerations," the evidence was served to prove the defendant's guilt of UUW beyond a reasonable doubt. *Id.*

¶ 46    In *Hannah,* the defendant was convicted of UUWF after a search based on a warrant. *Hannah,* 2013 IL App (1st) 111660, ¶¶ 1, 3. The warrant was issued after a confidential informant told the police he had purchased cocaine from a woman named "Angela" who lived there. *Id.* ¶ 3. The defendant was not named in the warrant, but the police found him, a woman named Angelica, and a young child sitting on the bed in the apartment's sole bedroom. *Id.* at ¶ 11. After the defendant and Angelica were detained, handcuffed, and moved to another room, officers

searched the bedroom and recovered a handgun hidden "between the mattresses on the bed." *Id.* The defendant told one of the officers that he owned the handgun. *Id.*

¶ 47    On appeal, the defendant contended, among other things, that the State failed to prove the *corpus delicti* of UUWF. *Id.* ¶ 21. This court found the handgun immediately accessible to the defendant when the police executed the warrant because he was sitting on the bed where the handgun was hidden, which "suggest[ed] that he had *immediate* control over the area." (Emphasis in original.) *Id.* ¶ 29. We concluded that the recovery of the handgun, when considered together with its location and the defendant's corroborating statement, established the *corpus delicti* of the offense. *Id.* ¶ 31.

¶ 48    In both *Spencer* and *Hannah*, this court concluded that the recovery of the firearm corroborated the defendant's incriminating statement. *Spencer*, 2012 IL App (1st) 102094, ¶ 22; *Hannah,* 2013 IL App (1st) 111660, ¶ 29. In both cases, this conclusion came in conjunction with a finding that the defendant exercised control over the area where police found the firearm. The State has not identified, and we have not located in our research, any case holding that the recovery of a firearm is sufficient to corroborate a defendant's incriminating statement absent a finding of control.

¶ 49    As discussed, the trial evidence does not support a finding of control. In contrast to *Spencer*, police recovered no personal items connecting Jones to the residence, and, unlike in *Hannah*, the firearm was not immediately accessible to Jones. Moreover, while Jones's statement described a specific location, that information speaks to knowledge of the firearm, not to control of the area. Constructive possession requires evidence of both knowledge and control. See *Walker*, 2020 IL App (1st) 162305, ¶ 20.

¶ 50    Given the facts, we reject the State's argument that the recovery of the firearm from the closet sufficiently corroborated Jones's incriminating statement in compliance with the *corpus delicti* rule. Thus, we reverse his conviction for AHC.

¶ 51                              Ineffective Assistance of Counsel

¶ 52    Jones asks that we remand for a preliminary inquiry under *Krankel*, 102 Ill. 2d at 181, as the trial court did not conduct a factual inquiry into the *pro se* posttrial allegation of ineffective assistance of counsel that was included in his PSI report.

¶ 53    When a *pro se* defendant brings a claim of ineffectiveness to the trial court's attention, the court should conduct a preliminary inquiry, during which it briefly discusses the allegations with the defendant, inquires with trial counsel about the facts and circumstances surrounding the allegations, and considers its knowledge of defense counsel's performance at trial. *People v. Jolly*, 2014 IL 117142, ¶ 30. If the court determines at the preliminary inquiry that the defendant's claim lacks merit or pertains to matters of trial strategy, it may deny the claim. *People v. Roddis*, 2020 IL 124352, ¶ 35. But, if the allegations show possible neglect of the case, new counsel should be appointed at a hearing on the claim. *Id.* ¶¶ 35-36.

¶ 54    For a preliminary *Krankel* inquiry, a defendant need only bring the claim to the trial court's attention orally or through a letter or note. *People v. Ayres*, 2017 IL 120071, ¶ 11. "No factual specificity is required; indeed, the point of the preliminary *Krankel* inquiry is to *develop* that factual specificity to determine whether the claim is sufficient to show possible neglect of the case, thus warranting the appointment of new counsel to independently present the ineffectiveness claim." (Emphasis in original.) *People v. Downing*, 2019 IL App (1st) 170329, ¶ 55. Whether a

defendant's allegations suffice to trigger the duty to conduct a preliminary *Krankel* inquiry presents a question of law subject to *de novo* review. *People v. Taylor*, 237 Ill. 2d 68, 75-76 (2010).

¶ 55    Jones's PSI report included this paragraph under the heading "Defendant's Version of the Offense":

> "[Defendant] was asked to discuss what happened on the day he was arrested, and he stated, 'I did not live at the residence. I was not at the residence. I did not have knowledge of a gun. I never gave a statement to the police regarding a gun. I never had keys in my possession of this residence. I asked my lawyer to challenge the search warrant, and he did not challenge the search warrant. I have mail from the Chicago Police Department headquarters with a different address and not the address of the search warrant. I have a state I.D. also proving my actual address. It does not have anything to do with [the] address on the search warrant. My fiancé was going to take the stand to tell the court my actual address. We lived together since August or September 2019, and this address is not the one on the search warrant. My fiancé was not put on the stand."

¶ 56    Jones argues that the paragraph raised at least two allegations of ineffective assistance: (i) counsel's failure to call a witness and present evidence supporting his defense that he did not live at the apartment; and (ii) counsel's failure to challenge the validity of the search warrant. Jones asserts that having made these allegations in the PSI report, he was entitled to a preliminary *Krankel* inquiry. The State responds that the trial court had no basis for conducting an inquiry; Jones did not make an oral allegation of ineffective assistance or raise the issue in a *pro se* posttrial motion, but rather, "only his PSI contained his claims that counsel had been ineffective."

¶ 57    Our supreme court's recent decision in *In re Johnathan T.*, 2022 IL 127222, resolves the issue. After the respondent was adjudicated a delinquent minor, the trial court directed the probation department to prepare a social investigation report (SIR) and ordered the respondent to undergo a sex offender evaluation. *Id.* ¶ 7. During the evaluation, respondent was asked "what kind of job" his lawyer was doing, responding, "We don't talk. I'm never prepared for the stand. He does not answer calls." *Id.* The evaluation, which included the respondent's answer to the evaluator, and the SIR were filed and reviewed by the trial court before the dispositional hearing. *Id.* Following that hearing, the court sentenced the respondent to the Department of Juvenile Justice for an intermediate period not to exceed his 21st birthday. *Id.* ¶ 9. This court affirmed. *In re Johnathan T.*, 2021 IL App (5th) 200247.

¶ 58    On appeal, our supreme court recently addressed whether the trial court erred by failing to conduct a preliminary *Krankel* inquiry in *Johnathan T.*, 2022 IL 127222. As an initial matter, the supreme court observed that in a juvenile delinquency proceeding, instead of a PSI report, the relevant statute required the probation department to prepare a SIR and, in cases involving sex offenses, a sex offender evaluation as part of the social investigation. *Id.* ¶ 48. Our supreme court acknowledged that the focus of these reports and evaluations did not specifically include screening for claims of ineffective assistance of counsel. *Id.* Nevertheless, because a defendant need only bring a claim of ineffectiveness to the attention of the trial court, "claims of ineffective assistance of counsel can be found in the sex offender evaluation." *Id.*

¶ 59    Significantly, the opinion added, "We find analogous the PSI required in adult criminal proceedings," where, though the focus does not specifically include screening for ineffectiveness claims, courts find the PSI report enough to provoke a *Krankel* inquiry. *Id.* ¶ 49. The court cited

with favor *People v. Craig*, 2020 IL App (2d) 170679, ¶ 18, and *People v. Sherman*, 2020 IL App (1st) 172162, ¶¶ 42-44. *Id.* ¶ 50. In *Craig*, this court held that defendant's claim of ineffectiveness appearing in the PSI report initiated a *Krankel* inquiry. *Craig*, 2020 IL App (2d) 170679, ¶ 18. Similarly, in *Sherman*, the "defendant's ineffectiveness claim in a PSI, intended to be read by the trial court, triggered a *Krankel* inquiry." *Sherman*, 2020 IL App (1st) 172162, ¶ 45. Our supreme court concluded in *Johnathan T.* that a preliminary *Krankel* inquiry was warranted where the respondent had made his statements to a court employee for inclusion in the SIR and evaluation reports, and the record made clear that the court read those reports. *Johnathan T.*, 2022 IL 127222, ¶¶ 51, 54.

¶ 60    As in *Johnathan T.*, *Craig*, and *Sherman*, Jones has raised a clear claim of ineffective assistance of trial counsel in a report "prepared specifically for the court" (*Craig*, 2020 IL App (2d) 170679, ¶ 18) and which the trial court was "expected to consider" (*Sherman*, 2020 IL App (1st) 172162, ¶ 45) and did consider. Thus, we find that Jones's allegations activated the trial court's duty to conduct a preliminary *Krankel* inquiry. We remand the cause for the limited purpose of allowing the trial court to inquire into the factual basis of Jones's ineffectiveness claim for failing to challenge the search warrant. See *Craig*, 2020 IL App (2d) 170679, ¶ 21. In light of the reversal of Jones's conviction for AHC, an inquiry into Jones's allegation of ineffectiveness based on counsel's failure to present evidence that he did not live at the apartment is unnecessary.

¶ 61    Reversed and remanded.